# CASES IN CHANCERY,

## JUNE TERM, 1847.

FRANCIS HEWITT ET UX. v. NATHANIEL J. CRANE ET AL.

1. When a father devises an estate to a son and daughters, the son knowing its value, and the daughters not knowing it, the son, when he enters into a treaty with the daughters for a different settlement and disposition of the estate among them, must apprise the daughters of its value, of their rights, and of every circumstance necessary to enable them to treat upon terms of equality; and concealment, misrepresentation, or any conduct on his part, calculated to put them at a disadvantage in the negotiation, will be fatal to the contract in a court of equity.

2. Courts of equity look with favorable eye on agreements made to preserve and maintain the peace of families, but only so far as such agreements are fairly obtained. If obtained by concealment and misrepresentation as to the value of the estate, courts of equity will not sustain them.

3. Before a party can be examined as a witness, an order must be obtained for that purpose.

This cause was heard by Stacy G. Potts, Esq., one of the masters of the court, the Chancellor having been concerned as solicitor and counsel for the complainants—the counsel of the respective parties having requested that Mr. Potts might be selected to hear the cause.

The facts of the case appear fully in the opinion delivered by the master.

*Oliver S. Halsted, Jr.,* and *A. Whitehead,* for the complainants.

*Robert Vanarsdale* and *Peter D. Vroom,* for the defendants.

STACY G. POTTS, MASTER.    Joseph Crane, of the county of

159

Essex, departed this life September 27th, 1832, having- first made and executed his last will. He left six children, Nathaniel Jones Crane, one of the defendants, his only son, and Hannah, Rachel, Phebe—wife of Alfred Keene—Eunice, and Amanda, his daughters, him surviving, all, at the time, unmarried, except Phebe.

By his will, dated the day before his death, he devised to Jones, the son, one-half of his cider-house and one acre of land adjoining the same; bequeathed $800 to Amanda, and the remainder of his estate he devised to Jones, Phebe, Hannah, Rachel, and Eunice, and their heirs, to be equally divided among them, and appointed Charles R. Akers his executor.

His estate, at the time of his death, consisted of the homestead farm, near Belleville, containing seventy-seven acres; a lot of Woodland in Caldwell, containing seventy-five acres; fifteen and a half acres of salt meadow, and personalty amounting to $3518.04.

His debts and funeral expenses were $192.89, which, with Amanda's legacy of $800, made $992.89 to be paid out of the estate.

Soon after his death, negotiations were set on foot for a different disposition of the estate from that made by the will, which resulted, on the 15th of October ensuing, in an arrangement among the four eldest devisees, Jones, Phebe, Hannah, and Rachel—Eunice being a minor—by which Phebe Keene and her husband took what is called the corner-house and two acres of land adjoining, part of the homestead, valued at $550, and Jones' bond for $950—in all, $1500. Hannah and Rachel each took Jones' bond for $1000, payable to them or their order, if they should demand the same in one year from date, without interest, and Jones took the residue of the whole estate, subject to the debts, the legacy to Amanda, and the widow's dower.

In July, 1835, Rachel married Francis Hewitt, and on the 14th of October, 1836, they filed their bill against Jones, alleging fraud, misrepresentation, and concealment on the part of Jones in procuring this agreement, and praying that it may be set aside, so far as the complainants are concerned, and they let in to take under the will. There is also an allegation that Han-

nah was incompetent to contract from weakness of mind, and that the complainant Rachel, as one of her heirs, had an interest in her estate that ought to be protected, and a prayer for general relief.

Hannah died without issue, pending the suit. After the bill was filed, the other devisees were made defendants.

Much testimony has been taken; the case has been elaborately argued; it involves important principles and consequences, and demands a deliberate and careful examination.

The principal difficulty lies in settling accurately the facts of the case. There is no question as to the character and quantity of the real estate, and I am disposed to make none as to the amount of the personalty. The first issue made by the pleadings and evidence is as to the fraud, misrepresentation and concealment in procuring the agreement alleged by the bill and denied by the answer.

To this issue, the testimony of Akers, the executor; Keene, the husband of Phebe, and Frost, who was the principal actor in bringing about the agreement, is directed.

An objection is made to the testimony of Keene, by the counsel of the defendants. The wife of Keene is a sister of Hannah, and one of her heirs-at-law; and, if the complainants succeed, is entitled to her share of whatever may be found due to her as one of the devisees of her father. The interest of the wife is, in this case, the interest of the husband; and though Keene's testimony was taken previous to Hannah's death, yet, upon the case as made in the bill, I think the objection must prevail. For, though his interest at the time in Hannah's estate was remote and contingent, yet, if the complainant succeeds, the record in this case might be important evidence for him in a suit brought by himself and wife; besides, the bill was demurred to on the ground that he, with others, was not a party; the demurrer was submitted to, and he was made a defendant, and no order was obtained for his examination. Before a party can be examined as a witness, an order ought to be obtained for that purpose. *Sharp* v. *Runk & King;* 1 *Halsted's Digest* 234; 1 *Newland's Ch. Pr.* 280.

Akers' testimony goes merely to show that he was making

preparations to enter upon his duties as executor under the will, when, a few days after Mr. Crane's death, Frost called on him and inquired whether he was willing to decline acting as executor, provided the devisees could arrange among themselves; he assented; agreed it would be better for them to do so, if they could; postponed any action till Mr. Frost made the result known to him, and then went, with Frost and Jones, to the surrogate's office and renounced; and Jones administered with the will annexed.

We are left, then, to the testimony of Mr. Frost. He was the brother-in-law of the testator. The narration he gives of the commencement, progress and conclusion of this arrangement is substantially as follows: He states that he was present at the funeral of the testator; that the family were in great distress, both on account of the death and the dispositions of the will, and pressed him to come down the next day. He did so. The will was read. Jones appeared dissatisfied with it, and none of the family appeared satisfied. When it was found Amanda had a legacy of $800, Rachel Ann said she would rather have that than her share of the land; she didn't know what she would do with the land. This he says led him to think whether Jones could not give them *this amount* and keep the land.

Hannah was willing. He went to Phebe Keene and told her. She was willing to do as the rest did, but her husband, Alfred Keene, kept back. He said it was not a full portion.

Mr. Frost persevered. He visited Keene four or five times in the course of a few days, and pressed the matter, and Keene finally proposed $1500 as the least he would take.

Frost informed Jones of this, and Jones said: "Then I shall give it up; I shall never think of settling." Frost, however, suggested that he and Jones should go into a calculation and see whether it was out of the way or not. They then made a calculation, and upon that calculation the estate amounted to a little over $1500 a share.

Frost then insisted that Jones should pay the girls $1000, instead of $800, and pay the debts and legacy. Jones objected; said it would involve him too much in debt; but finally yielded to Frost's solicitations and appeals, and agreed that he should

offer them $1000 ; and no further objection seems to have been made to Keene's demand of $1500.

The compromise then progressed. Frost proposed that Phebe Keene should take the corner house and lot as part of the $1500. She and her husband were willing, if they could agree with Jones upon the price. Jones was very loth to give it up, but finally agreed to let them have it, first, at $500, then at $550, having discovered that the lot contained half an acre more than was first supposed ; and Keene and wife were to have Jones' bond for $950.

Frost's account of the negotiation with Rachel, after this calculation had been made, is as follows : He says he first asked Rachel, "Are you willing to take $800, as you have offered ?" She said she didn't know but she should be, rather than take the land. Said he, "Rachel, the shares amount to $1500, as near as we can come at it ; but there are $200 debts, $800 legacy, and the widow's dower to come out ; now, Jones has agreed to give you $1000, and take them on himself ; will you be entirely satisfied ?" She said, "Yes, entirely satisfied." "Well, now," said he, "Jones will, besides, pay for the clothing you got on the funeral occasion." Then she clapped her hands and said, "I will never open my mouth, if it should be worth ten times as much."

Hannah, he says, simply acquiesced uniformly in what the others did.

Some other facts are stated by Frost which are important.

We learn from him that Jones was greatly dissatisfied with the will, and that this dissatisfaction exhibited itself very soon after the father's death. He said, in the earliest conversations about the estate, that he would sell his share and go away, if he could not get the whole of the real estate ; he would sell out his interest, and have nothing to do with it. This would break up the family. This, Frost deprecated, and labored to secure such terms for him as would induce him to remain.

Whether Jones knew the real amount of the estate or not, it is manifest Frost did not, at the time he first entered upon the plan of bringing about the arrangement, nor does it appear he learned it accurately afterwards. He proceeded, not upon the ascertained value of the property, but upon the idea that Jones

must be somehow satisfied ; and took as his basis the legacy of $800 left Amanda and the remarks of Rachel and Hannah, that they would prefer that to their share of the land ; and the idea never seems to have occurred to Frost that it was important to know the value of the interests with which he was dealing, until Keene insisted that he would take no less than $1500.

And, again, the calculation which he and Jones then made was manifestly erroneous. They had no papers, kept no memoranda, and did not exhibit even the estimate they made to the other parties. Frost does not remember what the farm or meadow was put down at; and he thinks the personal estate was set down at $1000—a mistake remarkable, when it is remembered that this was some days after the death ; that there were good money securities then in the house where the calculation was made, amounting to near $2500, and other property in the house and on the farm worth over $1000.

And it is clear that, from the beginning to the end of this negotiation, neither Jones nor Frost ever made out for the examination of the sisters, any inventory or estimate of the value of the real and personal property, nor ever gave them any information on the subject, except the communication that Frost made to Hannah and Rachel, after the calculation above mentioned.

In this state of facts it becomes important to settle, if we can, two questions : 1. What was the value of the estate at the time? 2. Did Jones know it?

Several witnesses have been examined as to the value of the land. Farrand, Riker, Crane, and Sidman put the homestead farm at about $100 an acre ; Randolph, Munn, and Cooman put it from $3850 to $4620 in the whole. There were 77 acres, generally good land. The buildings, though old, were substantial, and in pretty good order. It is admitted to have been worth $300 per annum, in 1832, and $400 now. Jones sold from it about $1500 of wood in lots, as it stood. Good land, in that neighborhood, was worth $100 an acre, and would yield $6 an acre clear. There was a cider-house on it, valued, with the land on which it stood, at $400, and a house called the corner-house, which, with the lot of two acres, was valued at $550. Weighing this testimony in connection with these facts, I think $7000

a low estimate of the value of the farm in 1832. A fair average of the value fixed by the witnesses will bring the 75 acres in Caldwell to $1100, and the salt meadow to $300. This will give us $8400 as the actual value of the real estate.

This was subject to the dower of Mrs. Crane, the widow. The witnesses fix the value of this at about $1000. The third of $8400 is $2800, the interest of this $168 per annum. She was 61 years of age. Upon the principles adopted in the annuity tables used by insurance companies, a woman of 61, of good health and constitution, must pay $1600 for a life annuity of $160; and deducting $8 per annum as the profit of the insurer, $1600 would be exactly equal to her dower in the real estate. I am disposed to adopt this as the fair value. This would leave the real estate worth $6800 free and clear of dower; then deduct $300 as the value of half the cider house with the one acre lot devised to Jones, and it leaves a clear real estate of $6500 for the general devisees.

Then take the personal estate at the value admitted by Jones, $3518, and deduct the debts, $192, the legacy to Amanda, $800, and $200 for commissions and expenses in settling the estate, and it leaves of personalty $2326. Add to this the $6500 of real estate, and we have $8826 as the entire value of the estate devised to Jones, Phebe, Rachel, Hannah, and Eunice, or $1765 each share.

I have not taken into consideration, on the one hand, the alleged undervaluation in the inventory of the personalty, nor, on the other, the alleged claim of Jones against the estate for services. I do not think either sufficiently proved.

But, 2. Did Jones know the real value of the estate at the time?

The allegations of the bill are that Jones was fully aware of the amount of money at interest; that complainant was ignorant, &c., and that he fraudulently concealed the information, &c. And again, that he knew the fact of there being money at interest, and the amount thereof, &c.; and that after he had, by means of his more favorable situation for the purpose, being the only son of the family, made himself acquainted with the nature and amount of the estate, he conceived the design, &c.

The defendant, in his answer, does not deny that he was aware of the amount of money at interest, or that he had made himself acquainted with the nature and amount of the estate. But he says that during all the time the subject of such arrangement was under consideration, all the bonds, notes, vouchers, securities, accounts, and other papers of the said Joseph Crane were in the possession and custody of his widow, the mother of the said Rachel Ann, and of this defendant, and not in the custody and possession of this defendant, and were as accessible to the said Rachel Ann as to this defendant. That he is informed and believes the value of the estate, real and personal, and Rachel Ann's interest and right therein was fairly and correctly represented to her by Frost; and denies that he was relied upon to furnish information respecting said estate, or that he concealed or attempted to conceal the value from her, or undervalued her right and interest in it.

This, so far from being a denial, is a substantial admission of the charge that "at the time of the negotiation he knew the true value and amount of both the real and personal estate."

That Rachel and Hannah, on the other hand, were ignorant of the real value of the estate, I think is manifest. They offered to take $800 when the shares of the personalty alone amounted to nearly $500 each, and it can hardly be supposed they would have been contented with that sum had they known this fact. It was putting their shares of the land at but a little over $300. The calculation made by Frost and Jones after Keene demanded $1500, was communicated to them as a new discovery made in the case, and Rachel said when the $1000, &c., was offered, that she would never open her mouth if it turned out worth ten times as much. This testimony is abundantly sufficient to rebut any presumption of knowledge which might be drawn from these circumstances and situation.

The case then, in short, is this: The defendant, aware that the sisters' shares of the estate, under the will, was over $1700 each, and without disclosing the true value, of which they were ignorant, to them, but causing or permitting the shares to be represented as worth only $1500, chargeable with debts, legacy, dower, &c., purchased the interests of Rachel and Hannah for

$940 each, (that being the real value of the bonds he gave) paying some small bills for Rachel in addition, and at the same time purchased the share of another sister, Phebe Keene, for $1500.

The answer of the defendant to this case is, the sisters were of age, were competent to contract, had the means of ascertaining the value of the property they were disposing of, were desirous of the arrangement, satisfied at the time the contract was executed, they acquiesced in it for several years, and it was a family arrangement designed to keep the property and the family together, and as such should be favorably regarded by the court.

We are then to inquire for the rules of law as administered by courts of equity in cases of this kind. It is the case of an agreement fully executed, and which must be sustained unless tainted with actual or constructive fraud in its inception.

And, 1. As to the objection of the acquiescence of the complainant up to the time of her marriage, the circumstances here, and the cases of *East and ux.* v. *Thornbury,* 3 *Peere Wms.* 127, and *Gillespie* v. *Moon,* 2 *Johns. Ch. R.* 585, and several other cases hereafter cited, furnish a sufficient answer.

In East and ux. *v.* Thornbury, the plaintiff had a legacy of £300 by the will of her uncle, payable one year after his death. The testator died in 1707. The legacy remained unpaid, and in 1721 the plaintiff demanded it. The executor desired them to wait two years; they consented, and under the impression that they were only entitled to interest on the legacy from the date of the demand, at the end of the time they received the £300 and two years' interest, and gave a receipt for it and the two years' interest up to the time of payment. The plaintiffs acquiesced in this settlement for 7 years, and then filed their bill, alleging the mistake and praying to have the arrears of interest paid. It was contended by the defendants that there was no pretence of fraud, no concealment or misrepresentation, that the will was of record and as accessible to the plaintiff as the defendant, that the plaintiff was a barrister at law and presumed to know his rights, and that the receipts were drawn by himself. But the court said the plaintiffs were, notwithstanding this, entitled to

have the mistake corrected, and decreed the interest to be paid.

In Gillespie v. Moon, it was held that a mistake made by the grantor in a deed, by which she conveyed fifty acres more land than she intended, might be corrected, though she had for several years taken no step to correct it, and although, in the meantime, the purchaser had put improvements upon the part not intended to be included by the grantor. And the Chancellor said it would be a great defect in the moral jurisdiction of the court if there was no relief for such a case.

2. Misrepresentation or concealment has always been held a clear ground for equitable relief against a contract brought about by such means. In *Fulton's Ex'rs* v. *Roosevelt*, 5 *Johns. Ch. R.* 173, Fulton bought a tract of land which was represented by the defendant to contain a valuable coal mine; the representation turned out to be untrue. The mine was not situated as represented, nor was it as accessible or as valuable, and the court enjoined the defendant from recovering the consideration agreed to be paid for it. This case was carried to the Court of Errors, and the decree affirmed. 2 *Cowen* 129. In this case, it seems Fulton made the application to purchase; Roosevelt communicated in writing the facts which induced him to place great value on the mine, and referred Fulton to Baker, an engineer in Fulton's employ, who confirmed the defendant's statements. The books are full of cases of this kind. But it is to the class of cases which relate to family settlements, and are more strictly analogous to the one in hand, that I have chiefly directed my attention.

Judge Story, in his valuable treatise on Equity Jurisprudence, Vol. I., Sec. 217, lays it down as a settled principle, that in cases of family agreements and compromise, if there is any concealment of material facts the compromise will be held invalid, upon the ground of mutual trust and confidence reposed between the parties, and he cites *Gordon* v. *Gordon*, 3 *Swanston.* 399 to 477; *Leonard* v. *Leonard*, 2 *Ball and Beatty* 171 to 182.

Gordon v. Gordon, above referred to, was several times elaborately argued, and decided by Lord Eldon upon great consideration. The case was that of two several agreements between two brothers, for the division of the family estates. One made

twenty years and the other four years before the filing of the bill; the eldest had been led to believe that his father and mother had not been married till after his birth, and that he was illegitimate. The younger was aware, at the time of the agreement, that there had been a marriage *de facto*; not that he knew the marriage was a legal marriage, but that a ceremony of marriage, whether valid or not, had been performed previous to the public marriage, and previous to the birth of his elder brother. The elder brother was not aware of this, and he, the younger, did not disclose the fact to him. The Chancellor said it was his duty to disclose it. He admitted fully the doctrine of *Stapleton* v. *Stapleton*, 1 *Atkyns*, and *Cann* v. *Cann*, 1 *Peere Wms.* 723, cited by the counsel for the defendants here, that where family agreements have been fairly entered into without concealment or imposition upon either side, and with no suppression of what is true, or suggestion of what is false, which was the fact in both those cases, then, although the parties may have greatly misunderstood their situation and mistaken their rights, a court of equity will not disturb the quiet which is the consequence of that agreement; but he said, that if James Gordon, the younger brother, knew that there was even a rumor of a private marriage, whether the fact had been so or not, yet, if he withheld it from his elder brother, the bargain could not stand. He said that in contracts of this kind full and complete communication of all material circumstances is what the court must insist on.

*Stapleton* v. *Stapleton*, 1 *Atkyns* 10, was considered by the court a reasonable agreement made between father and son, and no compulsion, concealment or misrepresentation pretended. It was held good.

In the case of Cann *v.* Cann, above alluded to, Lord Macclesfield admitted that if a party releasing is ignorant of his right, or if his right is concealed from him by the person to whom the release is made, these will be good reasons for setting aside the release; and in a note to that case, the case of *Broderick* v. *Broderick*, 1 *Peere Wms.* 239, is cited, and fully sustains this principle.

*Leonard* v. *Leonard*, the other case referred to by Judge Story, was decided in the Irish Chancery, by Lord Manners, in

1812. It was a bill to set aside a deed as fraudulent and void for misrepresentation and mistake. Estates were purchased by two half brothers; one died, and the heir of the deceased released to the survivor, for an annuity of £100, in consequence of an opinion adverse to the heir, obtained of counsel by the survivor, upon a case stating that the estates were held by original parties in joint tenancy; but it turned out that they held some of them as tenants in common. The case on which the opinion was founded had been submitted to the agent of the heir before it passed into the hands of counsel, and he made some alterations in it. But the survivor had the title deeds. The heir had acquiesced in the arrangement nine years. The release was set aside. The court said, when it is made manifest that the compromise was entered into between parties under a misapprehension of a fact known to the one party or his agent, and unknown or misrepresented to the other, the compromise is deficient in that which is essential to its validity—that both parties were in equal ignorance.

*Stockley* v. *Stockley*, 1 *Vesey and Beame* 23, cited by defendant's counsel, was a case decided by Lord Eldon, 7 years before the case of Gordon *v.* Gordon, and does not conflict with it in principle. There was no misrepresentation, no concealment, no mistake in that case; it was a case of ambiguity in a devise, and a settlement thereupon by two brothers under the advice of the grandfather and in his presence. The difficulty arose 18 or 19 years afterwards, on the grandfather's death. One of the sons alleged that he assented to the agreement upon the promise of the grandfather that he would make up the difference in value between the lands exchanged under the agreement, to the elder brother in his will; that brother formed expectations from the will that were not realized, and resisted a bill for specific performance of the agreement. Under these circumstances, the court established the agreement.

*Pullen* v. *Ready*, 2 *Atkyns* 587, was where legacies were given, to be forfeited by marriage without consent. One of the legatees did marry without consent; and a family arrangement took place, giving him the benefit of the legacy notwithstanding. In this case, in the language of Lord Hardwicke, "the agree-

Hewitt v. Crane.

ment was made after the marriage, and with the will out of which the forfeiture arose lying before the parties and their counsel." It was sustained.

*Corey* v. *Corey*, 1 *Vesey* 19, was a family agreement reasonable in itself but its enforcement was resisted by one of the parties, on the ground that he was drunk at the time; but it was not pretended that he was made so by the other parties, and no unfair advantage was taken. The agreement was held binding.

*Kinchant* v. *Kinchant*, 1 *Brown's Ch. C.* 369, was a family settlement, and was sustained by Justice Gould, who sat for Lord Thurlow. The complaint was, improper influence used by the father ; but the court held there was none; and Gould said, if the settlement had been an unreasonable one he would not have sustained it.

These cases go so far as to establish the principle that courts of equity look with a favorable eye upon agreements made to preserve and maintain the peace of families, but only so far as those agreements are fairly obtained. I do not understand that any of these cases go so far, nor have I been able to find a case, except *Frank* v. *Frank, Ch. Ca.* 84, that goes so far as to say that where there is concealment or misrepresentation, the suggestion of what is false, or the suppression of what is true, by either party to an agreement, courts of equity will sustain them, on the ground that they are family agreements ; and in many of the cases agreements have been set aside on the ground of mistake or misapprehension, where the agreement itself was grossly inequitable. In *Gee* v. *Spencer*, 1 *Vernon* 32, a case in Lord Nottingham's time, property was inherited by three sisters, which became involved in a Chancery suit, and the husband of one of the sisters released his interest to the others, in consideration that they would bear the charges of the suit. It was set aside on the ground of misapprehension of the party. And see *Pussey* v. *Desbouverie*, 3 *Peere Wms.* 315, and *Bingham* v. *Bingham*, 1 *Vesey* 126.

In reference to the case of Frank *v.* Frank, I have to say, on the authority of Eldon, in 10 *Vesey, Jr.*, 582; Loughborough, in 1 *Henry Blackstone* 332, and Ch. Kent, in 1 *Com.* 492, that Ch. Cases is a book of very indifferent authority ; and the case itself

has seldom been mentioned but with disapprobation. Lord Manners, in *Leonord v. Leonard,* repudiated it altogether.

There is a case in *Eden's Reports* 175, *Wyckerly* v. *Wyckerly,* decided by Lord Northington in 1763, which has been cited and relied on, where an estate was re-settled upon a family arrangement entered into by father and son upon the son's marriage; but that was an equitable arrangement, entered into upon a full and fair understanding all round. The allegation of undue influence exercised by the father was unsupported; and the Chancellor said if there had been want of consideration or undue means used in procuring it, his decision would have been different.

Applying, then, the principles which I find well settled in the books to the facts of this case, as I understand them, I feel bound to advise his Honor, the Chancellor, to make a decree in conformity with the prayer of the complainant's bill. For, I think the agreement with Rachel Ann and Hannah was, in the first place, inequitable. Upon the principles of this settlement with these two sisters, if it had been extended to Phebe, who was married, and Eunice, who was an infant, the four sisters would have received $940 each, as their shares, while the son would have taken the balance, being $4640, of an estate devised to him and his four sisters in equal shares; and it does not help the equity of the agreement, as between Jones and Rachel and Hannah, that Phebe, who had a husband to insist upon her rights, got $1500, or that Eunice, who was an infant, could not be made a party to it.

In the second place, I think there was some undue means used to procure this agreement. I cannot resist the unfavorable impression made upon my mind by the declarations of the son, repeated on every occasion of difficulty being interposed, that he would sell out his share and go away; that he must have all the land or he would have nothing to do with it. I think the dissatisfaction expressed by him the moment the will was read, and these declarations, so constantly repeated, had at least something to do with producing the ready consent of the sisters to take anything, even $800, rather than that their only brother, at such a time, should abandon his house and theirs, and leave them to

manage their share of the estate themselves. He was not so much afraid of debt, I think, as he professed to be, for though by the arrangement he got money securities of the estate to a large amount, he appropriated no part of it to pay his sisters, and he was reluctant to relieve himself from part of Keene's $1500 by parting with the corner-house and lot, which could have been no essential appendage to a farm of 77 acres; and the very indifference or reluctance he manifested towards becoming the purchaser, was calculated to depreciate, in the view of his sisters, the value of the estate. I see no good reason why he should have been dissatisfied with the will, nor why he could not have managed the land a little while as a tenant in common with his sisters, nor why he should not have told that it could, when Eunice came of age, or possibly before, be sold together, and the proceeds divided; though I do not say that I am so clear about it that I would venture to annul the agreement for this, were it the only point.

But, in the third place, I think there was here both improper concealment and misrepresentation. *Concealment* in this, that he did not, upon first entering on, or in the progress of the negotiation with his sisters, have a fair inventory or valuation of the estate made out and exhibited to them; and *misrepresentation* in this, that in the estimate he and Frost made, they put the personal estate at less than one-third of its true value, and suffered the sisters to act under that mistake. The bill charges him with full knowledge of the estate and its value, and he virtually admits it in his answer.

I feel bound to say, upon authority and upon principle, that where a father devises an estate to a son and daughters, the son knowing its true value, and the daughters not knowing it, the son, when he enters into a treaty with them for a different settlement and disposition of that estate, should be scrupulously careful to apprise them fully of its value, of their rights, and of every circumstance necessary to enable them to treat upon terms of perfect equality; and that concealment or misrepresentation, or any conduct on his part calculated to put them at a disadvantage in the negotiation, will be fatal to the contract, if a court of equity should come to deal with it.

The doctrine "*caveat emptor*" does not apply in such a case, because it will always be presumed, unless the contrary appear, that the sisters repose confidence in a brother.

This disposes of the case, without going into the question of Hannah's capacity to contract, or how far, if she was shown to be incapable, the court would interfere for the benefit of the heirs. All the objections to the contract made with Rachel apply with still greater force to that made with Hannah. She seems merely to have acquiesced, with little or no inquiry, in what the others did, and if she exercised any reflection or judgment about it, I see no evidence of it in the case.

I shall advise his Honor, the Chancellor, to decree that the releases executed by Rachel and Hannah be delivered up to be canceled, and that thereupon the bond held by Rachel be surrendered; and that Rachel and the heirs of Hannah be let in to their shares under the will of the testator, and that a proper account be taken under the order of the court.

REVERSED, 2 *Hal. Ch.* 631.